## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| PATRICK NICKLESON, PATRICIA NICKLESON ENTERPRISES, LLC, PATRICK NICKLESON ENTERPRISES, LLC, AND PBJ ENTERPRISES, LLC, | ) ) ) ) ) ) | **COURT FILE NO.:** |
| PLAINTIFFS, | ) ) | **COMPLAINT AND JURY DEMAND** |
| v. | ) ) | |
| A&W RESTAURANTS, INC. , YUM! BRANDS, INC., and JOHN DOES 1-99, | ) ) ) ) | |
| DEFENDANTS. | ) ) | |

Plaintiffs Patrick Nickleson ("Nickleson"), Patricia Nickleson Enterprises, LLC,

Patrick Nickleson Enterprises, LLC, and PBJ Enterprises, LLC (collectively the

"Nicklesons") for their Complaint against Defendants A&W Restaurants, Inc. ("A&W"),

Yum! Brands, Inc. ("Yum!"), and John Does 1-99 ("John Does") state and allege as

follows:

    1.    In August 2009, Defendant A&W knowingly sold to Minnesota residents,

Patrick Nickleson and Patricia Nickleson Enterprises, LLC, an unregistered franchise

located in Inver Grove Heights, Minnesota in violation of the Minnesota Franchise Act,

Minn. Stat. § 80C.01, et seq.

    2.    A&W also defrauded Nickleson and Patricia Nickleson Enterprises, LLC

by knowingly failing to make proper pre-sale franchise disclosures as required under the

Minnesota Franchise Act, the Federal Trade Commission's Amended Franchise Disclosure Rule, 16 C.F.R. § 436.1, et seq., and applicable common law.

3.      Among the many breaches of its legal duties to the Nicklesons, A&W willfully failed to provide the Nicklesons with a copy of its then existing March 2009 Franchise Disclosure Document detailing A&W's new ground-up, drive-in franchise offering – and the significant risks associated therewith.

4.      Representatives of A&W and Yum! were, upon information and belief, willing to engage in such unlawful conduct as a last ditch attempt to salvage some value for the A&W franchise brand -- one which A&W and its parent company, Yum!, had by this time come to realize has little meaningful growth potential.

5.      A&W's representatives sold Nickleson and Patricia Nickleson Enterprises, LLC on an investment in a new and unproven A&W drive-in prototype modeled on Sonic Corp.'s modern drive-in franchises.  A&W pitched the Nicklesons on building out a modernized drive-in unlike those A&W drive-ins which have existed for many decades in this state and elsewhere.

6.      Among the unlawful, pre-signing, representations by A&W and its representatives was their unlawful statement to the Nicklesons that the new A&W drive-in unit would generate over a million dollars in sales annually.

7.      A&W's representatives also unlawfully represented, pre-signing, to the Nicklesons that the new, modernized A&W franchises established within the State of Wisconsin in 2008-09 were already generating such sales figures -- even though the new,

Wisconsin-based franchise units were, in fact, grossly underperforming from a revenue standpoint.

8.     A&W's representatives materially failed in their duty and obligation to advise the Nicklesons, pre-signing, that the experiences of both A&W and Sonic Corp. had dictated that making multi-million-dollar investments in drive-in locations "north of the frost line" made no economic sense (as potential customers in snow-bound states do not commonly consider frequenting a drive-in in frigid weather).

9.     In so doing, A&W foisted upon the Nicklesons the substantial investment risk associated with building out A&W's modernized drive-in in Inver Grove Heights, Minnesota without the full and fair disclosure of all material facts required by applicable law.

10.    All the while, A&W was in the process of "re-franchising" two thirds of A&W's own corporate units -- by way of rapidly shedding A&W's own investment in its brand concepts -- a fact which A&W representatives sought to hide from the Nicklesons even though such fact is a required disclosure under Minnesota and federal law.

11.    Notably, immediately following A&W's failed launch of its modernized franchise offering in Minnesota and Wisconsin in 2008-09, Yum! announced that it was going to put the A&W franchise brand up for sale and focus on the growth of its core brands (KFC, Taco Bell and Pizza Hut).

12.    A&W's unlawful conduct, as more fully described below, justifies rescission of Patricia Nickleson Enterprises, LLC's franchise agreement and collateral agreements related to the Nicklesons' Inver Grove Heights, Minnesota franchise (the

"Inver Grove Heights Franchise") and an award of damages sufficient to return the Nicklesons to the financial position the Nicklesons would, otherwise, have occupied had the Nicklesons never been oversold on establishing the Inver Grove Heights Franchise.

## PARTIES

13.     Plaintiff Patrick Nickleson is a Minnesota resident, a high school graduate, and the principal shareholder of three operating entities, namely Patricia Nickleson Enterprises, LLC, Patrick Nickleson Enterprises, LLC, and PBJ Enterprises, LLC.

14.     Plaintiff Patricia Nickleson Enterprises, LLC is the entity which operated the former Inver Grove Heights Franchise on Buchanan Trail.

15.     Plaintiff PBJ Enterprises, LLC is the entity which operated the former A&W franchise located in Pine Island, Minnesota (just north of Rochester on Minnesota Highway 52).

16.     Plaintiff Patrick Nickleson Enterprises, LLC is the entity which operated the former A&W franchise located on Rice Street in Little Canada, Minnesota, as well as the former A&W/Long John Silver's co-branded franchise location in Coon Rapids, Minnesota.

17.     The Nicklesons were forced to close each of the above-described franchises as a direct and proximate result of the financial catastrophe which ensued immediately following the Nicklesons' opening of the Inver Grove Heights Franchise.

18.     A&W Restaurants, Inc. is, upon information and belief, a Michigan corporation with a principal place of business at 1441 Gardiner Lane, Louisville, Kentucky.

19.     Yum! Brands, Inc. is a North Carolina corporation with a principal place of business at 1441 Gardiner Lane, Louisville, Kentucky.

20.     Yum! expressly guarantees to assume the duties and obligations of A&W Restaurants, Inc. by the terms of the "Guaranty of Performance" which Yum! has typically offered by way of securing the registration of A&W's various franchise concepts, in those states which require franchisors to timely and properly register all of the franchise concepts they propose to sell to state residents before they may lawfully do so, including Minnesota.

21.     John Does 1-99 include those legal entities, executives, officers and other statutory "control persons" of Yum! and A&W, as defined by the Minnesota Franchise Act.

22.     Plaintiffs reserve the right to amend this Complaint to specifically identify such John Does following some reasonable discovery as such John Does shall be held jointly and severally liable for A&W's and Yum!'s violations of the Minnesota Franchise Act, per Minn. Stat. § 80C.17, subd. 2.

## JURISDICTION AND VENUE

23.     The parties to this matter are completely diverse.

24.     The amount in dispute substantially exceeds the jurisdictional threshold given that the Nicklesons have suffered damages totaling millions of dollars.

25.     Both the Defendants' pre-sale franchise disclosures made to the Nicklesons and the Inver Grove Heights Franchise Agreement specify that any litigation related to the Inver Grove Heights location shall proceed only in a Minnesota venue.

26.     This Court has personal jurisdiction over Yum! and A&W by virtue of their having engaged in ongoing business in Minnesota for many years, and by their having made representations to the Commissioner of Commerce of the State of Minnesota regarding A&W's various franchise concepts.

## BACKGROUND

27.     Prior to his 2009 purchase of a new A&W franchise to be established in Inver Grove Heights, Nickleson was already successfully operating three other A&W franchises.

28.     Nickleson's other A&W-brand franchises included: (a) a traditional/ vintage A&W drive-in which had initially been opened in 1964 in Little Canada, Minnesota and which Nickleson purchased in 2000 from an existing owner (the "Little Canada Franchise"); (b) a stand-alone A&W franchise in Pine Island, Minnesota which Nickleson purchased in 2004 from an existing owner (the "Pine Island Franchise"); and (c) a co-branded A&W/Long John Silver's food court location in a shopping mall in Coon Rapids, Minnesota, which Nickleson purchased from an existing owner in 2007 (the "Coon Rapids Franchise").

### A&W's New, Modern Drive-in Franchise

29.     None of the aforementioned A&W franchise locations were comparable to that which A&W sold to Nickleson in 2009.  The franchise concept sold to the Nicklesons for Inver Grove Heights in August of 2009 was among a new breed of A&W drive-in franchises which were built in ground-up fashion, were modeled on Sonic

Corp.'s modern drive-in locations, and which required a substantially greater initial investment than Nickleson's three other A&W franchises.

30.    As reflected IN CAPITAL LETTERS in the March 24, 2009 Franchise Disclosure Document ("FDD") which A&W prepared and presumably registered in states other than Minnesota and shared with other prospective franchisees for this new and different concept -- but failed to register with the State of Minnesota or provide to the Nicklesons at any point in time -- A&W's new prototype location was a "NEW, RECENTLY DEVELOPED BUILDING DESIGN WITH WHICH A&W HA[D] YET TO DEVELOP AN OPERATING HISTORY." See Exhibit A hereto, A&W's March 24, 2009 FDD on the second, unnumbered page identifying "RISK FACTORS."

31.    The first time Nickleson heard about A&W's new drive-in concept was at a Spring 2006 meeting in Rochester, Minnesota.    At that meeting, former A&W employees, Mark Bloomquist and David Barnowske were introducing area franchisees to some new A&W food items.

32.    A&W's Barnowske also mentioned at this Rochester meeting that A&W was going to establish a new, ground-up drive-in offering and that A&W would support any "growth ready" franchisee willing to purchase such a franchise.

33.    A&W's Barnowske also mentioned at this Spring 2006 meeting that a Florida franchisee, Bobby Lance, was about to open the first of such new A&W drive-ins.

34.    In 2007, after Lance had opened that new, Florida-based drive-in location, A&W's Bloomquist reported to the Nicklesons that Lance's new franchise sales were

7

strong and that A&W had developed a proven viable platform for making a broader launch of its new, drive-in concept.

35. Shortly after 2007, Bloomquist's title changed to Franchise Business Coach, and A&W assigned to Bloomquist the task of identifying franchisees who were growth-ready and capable of building out this new drive-in concept.

36. Bloomquist was encouraging Nickleson to consider building such a new franchise. His comment was that the new store is going to be "better than sliced bread."

37. Bloomquist explained to Nickleson at this point in time that Yum!'s whole focus was on growing the number of new A&W drive-in units, as many of the traditional drive-ins were likely to close over time rather than remodeling and renewing their A&W franchises.

38. Bloomquist further explained to Nickleson that Yum! wanted to open more stores by way of increasing marketing money available to existing franchisees to enhance the visibility of the A&W brand.

39. Even though Bloomquist was aware that Nickleson's recently acquired Coon Rapids Franchise was not quite cash flowing, Bloomquist continued to push Nickleson to sign up for, build, and operate the new A&W drive-in concept.

40. Over the period from 2006 through 2008, Bloomquist had been introducing Nickleson to other A&W representatives who were interested in growing the number of new ground-up A&W drive-in franchised units, including (former) A&W Vice President of Operations Dave Barnowske, (former) Yum! Franchise Development Director Don Loewen, (former) A&W Chief Operating Officer Andy Rosen, and Yum! Director of

8

Asset Strategy Doug Heinrich, all of whom were charged with identifying growth-ready A&W franchisees.

41.     As of 2008, A&W had also secured agreements from other current and prospective A&W franchisees who were willing to build out new, ground-up drive-in units in the State of Wisconsin.

42.     In connection with evaluating this new A&W ground-up drive-in opportunity, prospective franchisees like Nickleson were interested to see how the new, Wisconsin-based ground-up drive-ins would perform because the performance of these units would assist them in evaluating whether making a substantial investment in this new A&W ground-up drive-in franchise would have a reasonable and realistic opportunity to be successful.

**A&W's 2008 Sale Push**

43.     By early 2008, Nickleson was considering whether to establish a new, ground-up A&W drive-in franchise in Inver Grove Heights, Minnesota.

44.     At that time, A&W and Yum! representatives were in press mode in attempts to cause Nickleson and other Minnesota-based prospective franchisees to buy and build out new A&W drive-ins.

45.     On March 8, 2008, Yum!'s Don Loewen emailed to Nickleson a spreadsheet listing the revenue generated at other, competing restaurant locations in Inver Grove Heights. See Exhibit B hereto. Among other things, the spreadsheet circulated to Nickleson by Loewen suggested that the nearby McDonald's franchise was generating $1,999,000 in revenue as of 2003. (The significance of this fact, at least according to

A&W's representatives, would become clear to Nickleson the following month.   See *infra* at Paragraphs 48 to 57 of this Complaint.)

46.   On March 19, 2008, A&W presented to Nickleson a copy of its March 2007 Uniform Franchise Offering Circular ("UFOC").   See Exhibit C hereto.   This disclosure to Nickleson was notable in two key respects.   First, the March 2007 UFOC related to A&W's "traditional" franchise offering as opposed to A&W's new, ground-up drive-in locations.   Aside from the fact that the UFOC related to a different franchise offering, A&W's March 2007 UFOC was prepared pursuant to the outdated Uniform Franchise Offering Circular Guidelines rather than pursuant to the Federal Trade Commission's Amended Franchise Disclosure Rule, 16 C.F.R. § 436.1 (the new and updated disclosure format which became the mandatory disclosure format for nationwide use by July 1, 2008).

47.   Yum!'s Heinrich was also emailing Nickleson to invite Nickleson to attend a Rochester, Minnesota bus tour to discuss with A&W and Yum! executives the merits of establishing a new A&W drive-in franchise and to spend time identifying to prospective franchisees the sort of real estate that would be suitable for a build-out of such a new franchise.

**The April 2008 Bus Tour with A&W and Yum! Executives**

48.   A&W's Bloomquist arranged for the Rochester bus tour, which took place on April 22, 2008.

49.     Bloomquist suggested to Nickleson that attending the bus tour would be a good idea as "the right people" from Yum! were going to be in attendance to share with Nickleson how Nickleson could grow his family-operated franchise business endeavors.

50.     Nickleson agreed to attend the bus tour.

51.     A&W/Yum! representatives who attended and facilitated the bus tour included Bloomquist, Rosen, Loewen and Heinrich.

52.     Prospective A&W franchisees in attendance for the bus tour from the Rochester, Minnesota trade area included Nickleson (who owned the Pine Island Franchise to the north of Rochester) as well as Jay Jasperson, Wayne Mashele, and Kathy Simpson.

53.     The purpose of the bus tour was to market how A&W's new drive-in franchise would compare with and compete with existing restaurant businesses in the Rochester trade area, including the local McDonald's.

54.     The bus tour was approximately six hours in length providing the executives from A&W/Yum! sufficient time to make a detailed and thoroughgoing sales pitch to attending prospective franchisees.

55.     Among other things, Bloomquist, Rosen, and Heinrich -- all of whom sat near Nickleson on the bus tour -- each represented that A&W's new, ground-up drive-ins typically generated at least half of the sales revenue generated by any nearby McDonald's franchise.

56.     This representation was of particular significance to Nickleson, given that Loewen had already passed along to Nickleson the Exhibit B email reporting that the

nearby McDonald's in Inver Grove Heights generated two million dollars in annual revenue from which Nickleson, in reliance on A&W's bus tour representations cited in Paragraph 55, then determined that his would-be A&W ground-up drive-in franchise could expect to generate a million dollars in revenue annually.

57.    Nickleson was also presented with a handout during the Rochester bus tour which spoke to potential site locations, including information on the sales generated by competing restaurants located in Rochester, including McDonalds (just as did Loewen's Exhibit B email to Nickleson). The bus tour handout to Nickleson also suggested that the new A&W drive-in location recently established in Oshkosh, Wisconsin had cost less than the cost range identified in A&W's disclosure documents. See excerpts from A&W's April 22, 2008 bus tour handout attached hereto as Exhibit D.

58.    Because traditional A&W locations had typically generated revenues in a range between $600,000 and $800,000 annually, to Nickleson's understanding, Nickleson was encouraged by the communications he had been receiving from A&W representatives that he could expect to enjoy substantially higher annual revenues at the new ground-up A&W drive-in franchise.

59.    Nickleson was impressed with A&W's plan for new drive-ins, and was evaluating the potential establishment of a new, ground-up A&W drive-in site in Inver Grove Heights, Minnesota during the summer of 2008.

60.    Loewen had approved the Inver Grove Heights as a viable site and had A&W's upper management excited about the prospect that Nickleson might build out a new unit in that locality.

**Late 2008 Developments**

61.     As of late 2008, Bloomquist was engaged in regular face-to-face meetings with Nickleson about the potential for a new unit.

62.     Bloomquist reiterated that, if the local McDonald's in Inver Grove Heights was, by that time, generating $2.4 million a year, then Nickleson would generate $1.2 million annually in the operation of a new, ground-up A&W drive-in.

63.     During the course of his one-on-one meetings with Nickleson, Bloomquist was putting together, and sharing with Nickleson, budgets and forecasts for this potential new store.

64.     As of October 2008, Nickleson then decided not to pursue the purchase of a new franchise in Inver Grove Heights, over concerns regarding his ability to finance the cost of the new build out. Brickwell Bank ("Brickwell"), with which Nickleson had been working with for a potential loan, had also backed away from any commitment to provide financing, due to concerns regarding mortgage loans already in place with Brickwell's existing customers.

65.     After learning that Nickleson had then decided not to move forward with the purchase and build out, Bloomquist and a number of other A&W and Yum! executives contacted Nickleson and encouraged Nickleson to re-evaluate his decision to scrap the project, with their "help."

66.     Bloomquist advised Nickleson that the new Wisconsin-based units were experiencing strong sales revenue and continued to encourage Nickleson to purchase from A&W a franchise for a new unit.

67.     Bloomquist represented to Nickleson that Jim Bradjic's new Wisconsin-based A&W drive-in franchise had experienced strong opening sales. Bloomquist told Nickleson that Bradjic's Oshkosh, Wisconsin location was generating $80,000 to $90,000 per month in revenue.

68.     Nickleson resumed consideration of establishing a new unit, because of Bloomquist's suggestion that similar Wisconsin units were performing well.

69.     By way of evaluating whether building out a new unit was feasible, Nickleson put together a budget for the Inver Grove Heights location so that he would have something to present to would-be lenders.

70.     Nickleson's projection was based, in significant part, on Bloomquist's comments regarding existing unit cost and performance.

71.     As reflected in Exhibit E hereto, Nickleson's two-year profit and loss projection had the would-be unit generating net income of $47,060 and $68,473, respectively, during the first two years of operation.

72.     Nickleson shared his formalized Exhibit E projection with Bloomquist in a meeting during which Bloomquist reviewed the projection on a line by line basis. Bloomquist was aware that Nickleson was seeking Bloomquist's input for purposes of putting together a presentation to Nickleson's would-be lenders.

73.     Bloomquist agreed the projection was feasible and passed it along to Loewen and Heinrich for their review and approval, which approval was provided.

**Nickleson Seeks Lender Approval**

74.    In late 2008, Nickleson presented this projection to lenders, including the City of Inver Grove Heights and Platinum Bank, for their consideration on a possible loan on a would-be unit build out in Inver Grove Heights.

75.    Shortly thereafter, in January 2009, A&W's Lisa Ross was highlighting improved advertising opportunities for franchisees in the Twin Cities market.    See Exhibit F hereto.

76.    Ross suggested that Yum! will be able to leverage the power of its multi-brand presence to secure improved visibility of the A&W-brand franchise, particularly as new A&W units come into existence within the Twin Cities.

77.    Ross's representations in this regard regarding advertising were important to Nickleson because Nickleson believed that improved local advertising would enhance the returns of a new Inver Grove Heights franchise if he were to pursue a purchase.

78.    Nonetheless, as of early February 2009, Nickleson was still having difficulty securing a loan for a new franchise, and Nickleson so advised Heinrich.

79.    In response, Heinrich emailed to Nickleson an excerpt from Nation's Restaurant News entitled *"A&W to rollout new 'Three D' prototype"* in which A&W company officials were suggesting that, while A&W "would not release sales figures" for the five new 3-D prototypes, such company officials were quoted as being "very pleased with the performance" of the new units. See Exhibit G, a February 5, 2009 email from Heinrich to Nickleson with the referenced attachment. (By this point in time, (1) A&W was characterizing its new, ground-up construction drive-ins as "3-D" franchises,

referencing the customer's ability to drive-in, drive-through, or dine-in; and (2) A&W had, in fact, by then received "sales figures" for the performance of these units that, in fact, could not have caused any owner thereof to be "very pleased.")

80.     Upon information and belief, Heinrich forwarded this article (suggesting that new franchised units were all performing very well when, in fact, the new franchised units were not performing well) in order to encourage Nickleson, and his potential lenders, to move forward with a 3-D franchise purchase.

81.     As Heinrich and A&W reasonably expected, Nickleson shared Heinrich's February 5, 2009 email with prospective lenders, and Heinrich's email was helpful in securing financing for the would-be Inver Grove Heights location.

82.     At or about this time, A&W terminated Bloomquist's employment and assigned Steve Peltier the job functions previously handled by Bloomquist.  A&W suggested that Bloomquist's departure was the result of a "corporate reorganization" at A&W.

83.     After A&W terminated Bloomquist, Nickleson shared his Exhibit E projection with Peltier and, as Peltier had been working with other, Wisconsin-based 3-D franchisees, Peltier assisted in the preparation of mock staff schedules designed to facilitate Nickleson's assessment of would-be labor expense.

84.     Peltier's mock staff schedules were premised on the notion that Nickleson would need to have staff sufficient to service would-be customer sales totaling $23,000 to $25,000 per week (which, for a year, would equate to a range of $1,196,000 to $1,300,000 per year in sales).

85.    Upon information and belief, Peltier shared such figures with Nickleson by way of suggesting to Nickleson that, if Nickleson proceeded with the establishment of a new, 3-D location, Nickleson would enjoy annual sales revenue of $1,196,000 to $1,300,000.

86.    Upon information and belief, A&W and Peltier were aware by this time that A&W's new Wisconsin drive-ins were not performing as projected and, indeed, were financially failing, such that A&W and Peltier had no reasonable basis for suggesting the Nicklesons would enjoy annual revenues at his new ground-up A&W drive-in of $1.2 to $1.3 million.

87.    This fact notwithstanding, Peltier shared the projection set forth in paragraph 85 with Nickleson and continued to encourage Nickleson to establish a new 3-D location.

88.    Rather than sharing with Nickleson the financial struggles faced by the Wisconsin-based franchisees who had established similar, ground-up drive-in units, A&W representatives continued to falsely tout their success in that market.

89.    Nickleson went on with his effort to secure potential financing.

90.    Nickleson's lenders were interested in obtaining a copy of the would-be franchise agreement that Nickleson would sign if he were to become a new franchisee in Inver Grove Heights.

91.    Nickleson, accordingly, asked A&W Franchise Administrator Jeana Tussey for an agreement that he could share with his lenders.

92.     Tussey repeatedly responded on behalf of A&W that the "new agreement" was "not ready," such that Tussey could not immediately provide it to Nickleson.

93.     Of course, the "new agreement" referenced by Tussey in early 2009 was certainly ready by March 24, 2009.  By that date, A&W had already completed work on its new and updated Franchise Disclosure Document attached hereto as Exhibit A related to A&W's 3-D franchise offering, and the form agreement which must be attached thereto as an exhibit to the FDD.

94.     Rather than sharing with Nickleson A&W's new, concept-specific FDD and the "new agreement" attached thereto, Tussey ultimately forwarded to Nickleson only the "new agreement" itself, for review by Nickleson's would-be lenders.

95.     Furthermore, A&W failed to register its new, prototype 3-D FDD offering with the Minnesota Commissioner of Commerce as required by the Minnesota Franchise Act.

96.     As a result, A&W was barred from lawfully selling the new, prototype 3-D offering within the State of Minnesota.  See Minn. Stat. § 80C.02.

97.     Nonetheless, A&W continued its efforts to cause the Nicklesons, and other Minnesota-based prospective franchisees, to make a high-risk investment in A&W's new and floundering 3-D drive-in franchise offering.

**A&W's Violation of the Minnesota Franchise Act and the Amended Franchise Rule**

98.     What A&W and Tussey should have done at that time was to provide Nickleson with a copy of the 2009 FDD.  After all, A&W could not lawfully request that Nickleson sign the form of agreement attached to the 2009 FDD without ever having

presented Nickleson with the 2009 FDD, which, among other things, explained in some detail the significance and meaning of the franchise agreement that Nickleson would be asked to sign.

99.    A&W's and Tussey's failure to provide Nickleson with the new and updated FDD is a violation of the Federal Trade Commission's "Prohibitions" in the sale of franchises. Because Nickleson had made an express request for an updated agreement, A&W was duty-bound to provide the new FDD -- to which the new franchise agreement would be attached -- to Nickleson upon its completion on March 24, 2009. *See* Amended FTC Rule 16 C.F.R. § 436.9(e) and (f).

100.    A&W and Tussey's failure to do so is an unfair and deceptive trade practice within the meaning of the Amended FTC Rule regarding franchise disclosures and, among other things, is a material omission in violation of the Minnesota Franchise Act.

101.    Upon information and belief, A&W and Tussey knowingly declined to share the new FDD with Nickleson specifically because the FDD made clear that A&W's new drive-in concept was a high risk franchise proposition with no empirical track record for success -- exactly the opposite of what A&W and Yum! personnel had been telling Nickleson over the preceding year.

102.    By this time, Nickleson was entitled to receive a copy of the new FDD and A&W's new franchise offering: the ground-up 3-D drive-in.

103.    By contrast, the 2007 UFOC that Nickleson had been provided was related to "traditional" franchise units.

104. Other significant differences between the March 2007 UFOC which A&W did provide to Nickleson (*i.e.*, Exhibit C hereto) as contrasted with the 2009 FDD that A&W declined to provide (Exhibit A hereto – a document which Plaintiffs' counsel was forced to purchase from a third party document service, Frandata), include the following:

- The Cover Page of the FDD notes a higher, would-be investment range by way of alerting a prospective franchisee as to the likely cost of establishing the 3-D franchise;

- The "Effective Date" of registration with the Commissioner of Commerce of the State of Minnesota is missing in the FDD -- confirming that A&W never registered its new 3-D offering with the regulatory authorities at the State of Minnesota (such that A&W was barred from offering or selling such a franchise within the State of Minnesota);

- The vastly different personnel managing A&W, as reflected in the Item 2 disclosures, confirm that A&W engaged in a corporate reorganization (as acknowledged by A&W following A&W's termination of Bloomquist);

- The FDD Item 3 disclosures identify material new litigation matters against A&W and Yum! over the period from 2007-2009;

- The FDD's Item 6 disclosure notes a new required franchisee investment for a POS system with a price tag of $60k-$90k;

- The FDD's Item 8 disclosure notes material changes to A&W's cooperative advertising programs;

- The FDD's Item 9 disclosure identifies broader franchisee obligations to A&W;

- The FDD's Item 10 disclosure notes A&W's elimination of certain A&W-sponsored financing opportunities (signaling that A&W and its parent, Yum!, were no longer as willing to invest in direct financing assistance for new franchisees);

- The FDD's Item 11 disclosure highlights the A&W Marketing Committee's declining advertising percentage funding for co-ops, new media, and one-store markets;

- The UFOC Item 17 disclosure purported to highlight the franchisee's right to terminate the franchise per "Section 17.6" of the Franchise Agreement (even though neither the 2007 nor 2009 agreements incorporate any such provision number or substantive content in the would-be Franchise Agreement presented to the prospective franchisee);

- The UFOC Item 19 disclosure received by Nickleson fails to conform to the new, mandatory disclosure language required for franchise sales following July 2008. Specifically, the Amended Rule established under 16 C.F.R. § 436.5(s) mandates that a franchisor include the following representation: "The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential performance of its franchised units and/or franchisor-owned outlets, *if there is a reasonable basis for the information, and if the information is included in the disclosure document.*" (Emphasis added.) However, the Item 19 disclosure appearing at the written disclosure provided by A&W to Nickleson included neither above-described warning nor any substantiation for the sorts of financial performance representations made to Nickleson by Bloomquist, Rosen, Loewen, Peltier, and Heinrich. This warning would have been of consequence to Nickleson because, though he had previously purchased other franchises in the A&W system, Nickleson had always purchased such franchises from existing franchise owners (rather than A&W), such that Nickleson had always previously had the right to review the existing franchise owner's own business records by way of performing due diligence. A&W and its representatives, through their presentation of misleading financial performance representations regarding Wisconsin-based units (not appearing in the UFOC disclosure provided to Nickleson, let alone supported by written substantiation), materially misled Nickleson into purchasing the Inver Grove Heights Franchise;

- The FDD Item 20 disclosure notes A&W's dramatically diminished investment in corporate stores -- with A&W having closed or refranchised two thirds of its corporate stores between 2006 and 2008. (If a franchisor is no longer interested in

investing in its own brand, this is a material change that must be disclosed to a franchisee per Minn. R. 2860.2400(A) and Minn. Stat. § 80C.13; the 2007 UFOC did not capture this significant shift in corporate strategy by A&W.)   Additionally, only the 2009 version affirmatively identifies contact information for A&W franchisee association, NAWFA;

- The FDD references at Item 22 and attaches to the FDD a Franchise Agreement like the one that A&W presented to Nickleson for signature *despite never having provided Nickleson with a copy of the new FDD*. That is, A&W caused Nickleson to sign the 2009 3-D version of contract -- one not presented to Nickleson as an attachment to the 2009 FDD, let alone seven days prior to his signing of the agreement as required by the Minnesota Franchise Act, Minn. Stat. § 80C.06, subd. 5); and

- The FDD and UFOC Item 23 "receipts" are different (such that the prospective franchisee received the UFOC as opposed to the FDD receipt associated with the issuance of an FDD).

105.   A&W and its agents and representatives were duty-bound, by applicable statutory and common law, to disclose these aforementioned material changes to Nickleson.

106.   Had A&W presented Nickleson with the FDD which A&W had prepared by March 24, 2009, the Nicklesons would have had the opportunity to share it with franchise counsel and would not have established a franchise.

107.   A&W failed to present Nickleson with the 2009 FDD, however, depriving Nickleson of the opportunity to discuss the disclosures therein with counsel.

108.   Instead, encouraged by the financial performance representations made by A&W and its above-described representatives, Nickleson elected to move forward with the establishment of a new 3-D location as of mid-April 2009.

109.   Even though A&W had breached the legal requirement that it promptly provide Nickleson with the requested FDD as of its finalization on March 24, 2009, A&W still could have made the new FDD available to Nickleson sometime over the following month (*e.g.*, at the point in time when Tussey made the "new agreement" available for review by Nickleson and his would-be lenders).

110.   A&W did not do so.

111.   Indeed, as of mid-2009, Nickleson had not been asked to sign a franchise agreement or asked to return to A&W a receipt reflecting Nickleson's having received proper disclosure -- a tremendous franchise compliance blunder for an entity with the skilled staff and third party legal counsel employed by Yum! and A&W.

112.   This is particularly so given that, as of April 28, 2009, Nickleson tendered to A&W's Tussey a check in the amount of $10,000 for a site evaluation/approval to be performed by A&W.  See attached hereto as Exhibit H a copy of Nickleson's check to A&W ("Attn: Jeana Tussey").

113.   The Minnesota Franchise Act expressly requires that full franchise disclosure of all material facts be made to a prospective franchisee on the following timeline: "Any person offering for sale or selling a franchise which is subject to the registration requirements imposed by section 80C.02 shall, at the person's own expense, present to the prospective franchisee, *at least seven days prior to the execution of by the prospective franchisee of any franchise or other agreement, or at least seven days prior to the payment of any consideration by the franchisee, whichever occurs first, a copy of the current public offering statement [the FDD] together with all proposed agreements*

*relating to the sale of the franchise.*" See Minn. Stat. § 80C.06, subd. 5 (emphasis added).

114.   Nickleson did not sign the Inver Grove Heights Franchise Agreement until August 7, 2009. *See* the Inver Grove Heights Franchise Agreement attached hereto as Exhibit I. Consequently, Minnesota law required that A&W present Nickleson with a copy of A&W's *current* public offering statement -- *i.e.*, the March 24, 2009 FDD -- seven days in advance of the check payment made for site approval on April 28, 2009.

115.   A&W failed to present Nickleson with a copy of its "current" disclosure statement as of April 21, 2009 (*i.e.*, seven days in advance of the check payment made for site approval on April 28, 2009) or at any other point in time, for that matter.

116.   Patricia Nickleson Enterprises LLC signed the Contract for Private Development with the City of Inver Grove Heights, Minnesota on May 6, 2009. *See* Exhibit J hereto. Had the Nicklesons received proper disclosure with respect to A&W's new franchise offering, neither the Nicklesons nor the City of Inver Grove Heights, Minnesota would not have executed this contract (through which the City of Inver Grove Heights, Minnesota agreed to loan Nickleson $50,000 to cover property development expenses).

117.   The City of Inver Grove Heights, Minnesota relied on the content appearing in Exhibit E hereto in agreeing to provide Nickleson with such financing, and, as discussed *supra*, the content of that projection was premised on unwarranted representations made by A&W's Bloomquist.

24

118.    Amazingly, A&W's Tussey did not request that Nickleson return his disclosure documentation receipt (for the out-of-date UFOC) until emailing Nickleson a request for such a receipt in June 2009 (at which time Tussey noted that, *with Nickleson's construction of the Inver Grove Heights franchise already underway*, it was important that A&W receive a signed disclosure receipt).

119.    At this point in time, Nickleson returned to Tussey a signed receipt for the only disclosure documentation he had ever received from A&W -- namely, the March 2007 UFOC receipt. *See* the UFOC receipt attached hereto as Exhibit K.

120.    The Exhibit K receipt that Nickleson provided to Tussey in late June 2009 clearly reflects Nickleson's receipt of the "OFFERING CIRCULAR" as opposed to the FDD "DISCLOSURE DOCUMENT" (a sample of which can be found at the last page of Exhibit A hereto).

121.    Upon receiving the Exhibit K receipt, A&W and Tussey had further express evidence that that they had failed to provide Nickleson with the 2009 FDD.

122.    Nonetheless, upon receiving merely a receipt for a 2007 UFOC (as opposed to a 2009 FDD), A&W and Tussey remained silent and allowed Nickleson to continue to completion with what turned out to be a $1,800,000+ franchise build out in Inver Grove Heights, Minnesota.

**The Inver Grove Heights Franchise Opens for Business**

123.    Nickleson opened the Inver Grove Heights Franchise on August 5, 2009.

124.     As referenced *supra*, however, the Franchise Agreement relating to the Inver Grove Heights Franchise was not even signed until after the opening of that new unit, on August 7, 2009.

125.     In any event, based on A&W's representations, the Nicklesons had high hopes for the potential sales of the new Inver Grove Heights Franchise.

126.     The hoped-for sales never materialized.

127.     The grand opening was planned for September of 2009.  While the Inver Grove Heights Franchise enjoyed a strong opening month of sales, the sales trailed off by late 2009 -- just a few months after the grand opening -- and never recovered.

128.     A&W ceased to be willing to make any material advertising effort in the local area, and this hampered sales further.

129.     The Inver Grove Heights Franchise generated about $650,000 in gross sales in 2010 -- sales figures that may be acceptable for a traditional A&W drive-in (where little to no equity build out investment need be made).  However, such a minute sales figure -- for a unit that cost over $1,800,000 for land and build-out -- crippled Nicklesons' ability to operate the Inver Grove Heights Franchise and the other three A&W franchises owned and operated by the Nicklesons.

130.     Almost immediately following the opening of the Inver Grove Heights Franchise, the Nicklesons' cash flow plummeted.

131.     Unable to pay A&W its demanded royalties and advertising fees, the Nicklesons were evaluating having to close all of their four franchises.

132.   In a final attempt to salvage his family business, in December 2010, Nickleson wrote to A&W CEO David Novak asking for assistance to turn around the Inver Grove Heights Franchise.

133.   Novak did not reply.

134.   In January 2011, Nickleson was forced to close each of the four franchises.

135.   The Nicklesons have suffered millions of dollars in damages -- all precipitated by Defendants' illegal sale of the Inver Grove Heights Franchise.

136.   Following A&W's failed launch of the new, 3-D prototype, Yum! announced that A&W will be sold off.

137.   In retrospect, it becomes apparent that A&W's representatives took significant legal risks (failing to make proper written disclosure, making illegal financial performance claims, failing to register) in order to launch a growth-oriented franchise sales plan designed to grow the A&W franchise brand.

138.   A&W's plan failed, and it cost the Nicklesons' their family business.

139.   Nickleson reasonably believes that A&W and its representatives were willing to characterize him as "growth ready" even though Nickleson was not growth-ready as viewed by objective standards.

140.   Nickleson also reasonably believes the A&W's representatives were willing to make illegal financial performance claims to him in order to elicit Nickleson's agreement to build out a new 3-D franchise and, thereby, to allow A&W's representatives to earn significant "blue chip" bonus payments from their employer – bonuses tied to their getting new ground-up A&W drive-ins opened prior to calendar yearend.

141. Plaintiffs demand a jury trial.

## COUNT ONE
### Violation of Minnesota Franchise Act

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

142. A&W sold Nickleson and Patricia Nickleson Enterprises, LLC a "franchise" as defined by the Minnesota Franchise Act, Minn. Stat. § 80C.01 et seq.

143. A&W is a franchisor as defined by the Minnesota Franchise Act. Minn. Stat. § 80C.01, subd. 6.

144. The Minnesota Franchise Act governs the relationship between A&W and Nickleson's Inver Grove Heights Franchise by the terms of Minn. Stat. § 80C.19, subd. 1 (providing that "[t]he provisions of sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this state.").

145. The Minnesota Franchise Act applies to the dispute in regard to the Inver Grove Heights Franchise because that franchise was located within the State of Minnesota.

146. Minn. Stat. § 80C.02 specifies that: "No person may offer or sell any franchise in this state unless there is an effective registration statement on file in accordance with the provisions of sections 80C.01 to 80C.22 or unless the franchise or transaction is exempted under section 80C.03."

147.   A&W and John Does 1-99 violated the Minnesota Franchise Act by failing to register for sale A&W's new, ground-up, 3-D drive-in concept and, thereafter, both offering for sale and selling to Nickleson such an unregistered franchise offering.

148.   Plaintiffs' counsel has verified with the Minnesota Department of Commerce's Daniel E. Sexton that A&W did not register a franchise offering for the 3-D concept -- like that appearing in the form 2009 FDD attached hereto as Exhibit A -- with the State of Minnesota.

149.   Minn. Stat. § 80C.04, subd. 1, provides that: "An application for registration of a franchise shall be made by filing with the commissioner a proposed public offering statement accompanied by a fee of $400."

150.   A&W and John Does 1-99 violated the Minnesota Franchise Act by failing to register for sale A&W's new, ground-up, 3-D drive-in concept (*e.g.*, by presenting to Minnesota's Commissioner of Commerce a copy of A&W's 2009 FDD).

151.   Minn. Stat. § 80C.05, subd. 5, provides that: "Any person offering for sale or selling any franchise which is subject to the registration requirements imposed by section 80C.02 shall, at the person's own expense, present to the prospective franchisee, at least seven days prior to the execution by the prospective franchisee of any franchise or other agreement, or *at least seven days prior to the payment of any consideration by the franchisee*, whichever occurs first, *a copy of the current public offering statement together with a copy of all proposed agreements relating to the sale of the franchise.* The franchisee shall be permitted to retain the public offering statement prior and subsequent to the execution of any franchise or other agreement. The person offering or

selling the franchise shall obtain a receipt, signed by the prospective franchisee, acknowledging receipt of a copy of the public offering statement prior to executing any franchise or other agreement and prior to paying any consideration. The receipt shall be kept in the possession of the person offering or selling the franchise, subject to inspection by the commissioner, for a period of three years, from the date the receipt is taken." (Emphasis added.)

152.   A&W and John Does 1-99 violated Minn. Stat. § 80C.05, subd. 5, by failing to present to Nickleson with the 2009 FDD at least seven days prior to his April 28, 2009 check to A&W in the amount of $10,000.

153.   A&W and John Does 1-99 further violated Minn. Stat. § 80C.05, subd. 5 by later presenting to Nickleson the Inver Grove Heights Franchise Agreement, without having first provided to Nickleson the 2009 FDD, accompanied by the would-be Inver Grove Heights Franchise Agreement.

154.   A&W and John Does 1-99 further violated Minn. Stat. § 80C.05, subd. 5 by failing to procure from Nickleson a receipt for its "current public offering statement" – *i.e.*, the 2009 FDD.

155.   Minn. Stat. § 80C.07 provides that: "A person with a registration in effect shall, within 30 days *after the occurrence of any material change in the information on file with the commissioner, notify the commissioner in writing of the change by an application to amend the registration accompanied by a fee of $100.* The commissioner may by rule define what shall be considered a material change for such purposes, and may determine the circumstances under which a revised public offering

statement must accompany the application. If the amendment is approved by the commissioner, it shall become effective upon the issuance by the commissioner of an order amending the registration. The commissioner may withdraw an amendment application that has not become effective. If no activity occurs with respect to the application for a period of 120 days, the commissioner may by order declare the application withdrawn." (Emphasis added.)

156.   To the extent that A&W asserts that A&W's 2007 UFOC constitutes an adequate pre-sale disclosure to Nickleson, A&W and John Does 1-99 violated Minn. Stat. § 80C.07 by failing to notify the Minnesota Commissioner of Commerce of the material changes to the content of the 2007 UFOC. See, *e.g.*, Paragraph 104 of this Complaint.

157.   A&W and John Does 1-99, likewise, hid such material changes from Nickleson, in violation of Minn. Stat. § 80C.13.

158.   Minn. Stat. § 80C.10 provides that: "Every franchisor or subfranchisor offering franchises for sale in this state shall at all times keep and maintain a complete set of books, records and accounts of such sales, which shall at all times be open to inspection by the commissioner."

159.   Upon information and belief, A&W and John Does 1-99 have violated Minn. Stat. § 80C.10 by failing to maintain a complete set of books, records, and accounts of franchise sales.

160.   Plaintiffs' counsel requested that A&W's attorneys provide a copy of A&W's receipt reflecting disclosure, and A&W's counsel refused to provide any such

receipt. Upon information and belief, A&W and its attorneys so refused in the hope and expectation that it will increase the Nicklesons' cost of pursuing relief under the Minnesota Franchise Act, and thereby dissuade them form doing so.

161.   Minn. Stat. § 80C.13, subd. 1, provides that: "No person may make or cause to be made any untrue statement of a material fact in any application, notice, report, or other document filed with the commissioner under sections 80C.01 to 80C.22, or omit to state in any such application, notice, report or other document any material fact which is required to be stated therein, or fail to notify the commissioner of any material change as required by section 80C.07."

162.   A&W and John Does 1-99 have violated Minn. Stat. § 80C.13, subd. 1, by failing to notify the Minnesota Commissioner of Commerce of the untrue statements of material fact appearing in A&W's written disclosures, or, alternatively, failing to notify the Minnesota Commissioner of Commerce of material changes to the content of its registration materials.

163.   Minn. Stat. § 80C.13, subd. 2, provides that: "No person may offer or sell a franchise in this state by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

164.   Representatives of A&W and Yum!, including John Does 1-99, knowingly engaged in misleading written and oral communications designed to elicit

Nickleson's establishment of the Inver Grove Heights Franchise as more fully described above in the body of this Complaint.

165.   Most notable among such communications were the repeated, illegal financial performance representations made to Nickleson outside the context of any disclosure document and the knowing failure to provide Nickleson with a copy of the 2009 FDD.

166.   A&W's disclosure obligation is broadly construed as requiring that the franchisor disclose all material facts to a prospective franchisee, like Nickleson.

167.   Minn. Rule 2860.1200, subpart 2, provides in relevant part that: "The information requested is not to be viewed as determinative of the entire obligation of disclosure. *Disclosure means more than merely compiling the information requested by the application form or supplying the information suggested by the guidelines.* The extent of the required disclosure will depend upon the materiality of the particular facts and circumstances involved. This obligation is the independent obligation of all persons contributing to the disclosure including the franchisor and its counsel and accountant, to the extent of their professional involvement therein." (Emphasis added.)

168.   A&W and John Does 1-99 violated their obligations to Nickleson by presenting him with a 2007 UFOC relating to A&W's traditional franchise offerings and, thereafter, ignoring their obligation to provide him with updated and concept-specific information appearing in the 2009 FDD.

169. The Inver Grove Heights Franchise was not a "traditional" A&W franchise offering. It was, instead, the newer and (as acknowledged by A&W in writing) riskier franchise offering documented in A&W's 2009 FDD.

170. Minn. Stat. § 80C.13, subd. 3, provides that: "No person may represent or cause to be represented to any prospective purchaser of a franchise that the filing of any document under sections 80C.01 to 80C.22 or the registration or exemption from registration of a franchise constitutes a finding by the commissioner that any document filed under sections 80C.01 to 80C.22 is true, complete, and not misleading, or that the commissioner has passed in any way upon the merits of any franchise, and no person may represent that a franchise is registered or exempted from registration when in fact, such is not the case."

171. A&W violated Minn. Stat. § 80C.13, subd. 3, by suggesting that A&W had registered the 3-D concept, and the "new agreement" related thereto, when, in fact, such a concept had never (and has never) been registered in the State of Minnesota.

172. Minn. R. 2860.4500(B)(1) declares that it is a "false, fraudulent, or deceptive practice" within the meaning of Minn. Stat. § 80C.13 if any person makes or causes to be made any statement or representation that is contrary to any disclosure made in the public offering statement.

173. As detailed *supra*, A&W, Yum!, and John Does 1-99 suggested on the April 22, 2008 Rochester bus tour that the actual cost of construction of a new 3-D unit

was less than the cost identified in the disclosure document in violation of Minn. R. 2860.4500(B)(1).

174.   As detailed *supra*, A&W, Yum!, and John Does 1-99 made multiple financial performance representations to Nickleson despite claiming in Item 19 of the UFOC that A&W and its agents make no such representations.  Each such instance of conduct constitutes a violation of Minn. R. 2860.4500(B)(1).

175.   Minn. R. 2860.4500(B)(2)(b) declares that it is a "false, fraudulent, or deceptive practice" within the meaning of Minn. Stat. § 80C.13 if any person "makes or causes to be made any statement or representation with regard to ... projections of operations or of income or gross or net profits capable of being obtained from operation of the franchise by the franchisee without written disclosure of the number of the franchisor's existing franchised businesses that have, to the franchisor's knowledge, actually attained that projected level."

176.   As detailed *supra*, A&W, Yum!, and John Does 1-99 made multiple financial performance representations to Nickleson regarding the costs and revenues generated by new, Wisconsin-based ground-up, A&W drive-in franchises but did so: (1) without providing any information as to what percentage of the new, Wisconsin-based franchisees had seen their costs and revenues fall in the range identified by A&W, Yum!, and John Does 1-99; and (2) without providing any information as to what percentage of all of the new ground-up A&W drive-in franchises had revenues in the range identified by A&W to Nickleson.   Each such omission constitutes a violation of Minn. R. 2860.4500(B)(2)(b).

177.   Minn. R. 2860.4500(C)(2) declares that it is a "false, fraudulent, or deceptive practice" within the meaning of Minn. Stat. § 80C.13, if any person fails to state in writing the qualifications that a franchisee should have in order to successfully operate the franchised business.

178.   A&W and John Does 1-99 violated Minn. R. 2860.4500(C)(2) by verbally suggesting to Nickleson that Nickleson was "growth ready" when, upon information and belief, Nickleson had not met A&W's own, internal criteria for approval as being financially prepared to build out and operate the new, 3-D drive-in.

179.   Minn. R. 2860.4500(C)(3) declares that it is a "false, fraudulent, or deceptive practice" within the meaning of Minn. Stat. § 80C.13 if any person fails to make any representation required to be made in the public offering statement.

180.   As developed *supra*, despite having launched a new 3-D franchise offering and having prepared a 2009 FDD in connection with that franchise offering, A&W and John Does 1-99 failed to provide Nickleson with a copy of the 2009 FDD and, likewise, failed to provide to Nickleson the information that would have been required to appear in the 2009 FDD, if fully and accurately prepared.   Each such omission constitutes a violation of Minn. R. 2860.4500(C)(3).

181.   A&W and John Does 1-99, likewise, failed to alert Nickleson to the numerous material changes that had occurred in connection with A&W's new, 3-D franchise offering in violation of Minn. R. 2860.4500(C)(3).

182.   Minn. R. 2860.4500(D)(2) declares that it is a "false, fraudulent, or deceptive practice" within the meaning of Minn. Stat. § 80C.13 if any person

36

misrepresents that the franchise agreement and all of its obligations is or are embodied in a document presented to the franchisee.

183.   A&W and John Does 1-99 knowingly provided to Nickleson a 2007 UFOC, and the form agreement attached to the 2007 UFOC, and, thereafter, without presenting Nickleson with a 2009 FDD, caused Nickleson to sign the form agreement appearing as an attachment to the 2009 FDD.  Such conduct was a violation of Minn. R. 2860.4500(D)(2) because, by providing Nickleson with only the 2007 UFOC, A&W was necessarily suggesting that the form agreement attached to the 2007 UFOC was the agreement that Nickleson would execute in connection with his 3-D franchise purchase in Inver Grove Heights.

184.   Minn. Stat. § 80C.14 prohibits any person's use of an "unfair practice" in the sale of a franchise in the State of Minnesota.  More specifically, Minn. Stat. § 80C.14, subd. 1, provides that: "No person, whether by means of a term or condition of a franchise or, otherwise, shall engage in any unfair or inequitable practice in contravention of such rules as the commissioner may adopt defining as to franchises the words 'unfair and inequitable.'"

185.   A&W and John Does 1-99 have engaged in an unfair practice in violation of Minn. Stat. § 80C.14 by attempting to force the Nicklesons to litigate in a forum other than Minnesota.

186.   The Minnesota Franchise Act incorporates an "anti-waiver" provision which specifies that any purported waiver of rights under the Act (e.g., via a contractual choice of law or choice of forum clause) is void.

187.   Minn. Stat. § 80C.21 explicitly provides that: "Any condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise is a resident of this state, or, in the case of a partnership or corporation, organized or incorporated under the laws of this state, or purporting to bind a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.".

188.   The Minnesota Franchise Act authorizes the Minnesota Commissioner of Commerce to promulgate rules to carry out the provisions of the Minnesota Franchise Act.  See Minn. Stat. § 80C.18.

189.   The Minnesota Commissioner of Commerce promulgated Minn. R. 2860.4400(J) which expressly provides that it is an unfair and inequitable practice for a franchisor to "require a franchisee to waive his or her rights to a jury trial or to waive rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction."

190.   Minn. Stat. § 80C.17, subd. 1, provides that: "A person who violates any provision of this chapter or any rule or order thereunder shall be liable to the franchisee or subfranchisor who may sue for damages caused thereby, for rescission, or other relief as the court may deem appropriate.

191.   Minn. Stat. § 80C.17, subd. 3, provides that: "Any suit authorized under this section may be brought to recover the actual damages sustained by the plaintiff together with costs and disbursements plus reasonable attorney's fees."

192.   Plaintiffs are entitled to damages and/or rescission, as well as their costs, disbursements, and attorneys' fees incurred in connection with this suit.

193.   Minn. Stat. § 80C.17, subd. 2, provides that: "Every person who directly or indirectly controls a person liable under subdivision 1, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions and every employee of a person so liable who materially aids in the act or transaction constituting the violation is also liable jointly and severally with and to the same extent as such person, unless the person who would otherwise be liable hereunder had no knowledge of or reasonable grounds to know of the existence of the facts by reason of which the liability is alleged to exist.

194.   John Does 1-99 are jointly and severally liable under Minn. Stat. § 80C.17, subd. 1, for A&W's violations of the Minnesota Franchise Act.

195.   Yum! is liable for A&W's violations of the Minnesota Franchise Act as Yum! purports to be a guarantor of all of A&W's obligations within registration states, including the State of Minnesota.

196.   Plaintiffs reasonably believe their claim under the Minnesota Franchise Act to substantially exceed the jurisdictional threshold of this Court.

197.   Plaintiffs seek recovery of their actual and consequential damages, as well as costs, disbursements, and attorneys' fees.

198.   Plaintiffs reserve the right to later amend the Complaint to state a claim for punitive damages consistent with *Team Tires Plus, Ltd. v. Heartlein,* Bus.

Franchise Guide (CCH) ¶ 12,820 (D. Minn. 2004); and *Noodles 1, LLC v. Wild Noodles Franchise Co., LLC,* Bus. Franchise Guide (CCH) ¶ 13,349 (D. Minn. 2006).

## COUNT II
## DECLARATORY JUDGMENT

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

199.    Rescission is appropriate relief under the Minnesota Franchise Act and the common law of the State of Kentucky.

200.    The conduct by A&W in inducing Plaintiffs to serve as franchisees/guarantors and to make substantial investments of time and money in reliance on A&W's unjustified representations to Plaintiffs constitutes a prior material breach of contract or nullifies the parties' franchise agreements, and collateral agreement including guarantees and notes, and excuses Plaintiffs from any further performance thereunder.

201.    Plaintiffs request that this Court enter declaratory judgment consistent with the foregoing.

202.    Plaintiffs further request a declaration that any and all monetary claims by Defendant A&W against Plaintiffs be dismissed as inconsistent with Plaintiffs' rescission rights.

## COUNT III
## FRAUD BY OMISSION

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

203.    A&W and Yum! sell franchises within the State of Minnesota.

204.   Consequently, A&W and Yum! are bound to make certain affirmative, pre-sale disclosures consistent both the Minnesota Franchise Act and the FTC's Amended Rule, 16 C.F.R. § 436.1, et seq.

205.   As a result, A&W and/or Yum! may be deemed to have violated their obligations to a franchisee by failing to make disclosures consistent with those statutory enactments -- both of which impose affirmative disclosure obligations.

206.   A&W and Yum! made certain statements, representations and non-disclosures set forth in the preceding paragraphs, including, but not limited to, the financial performance representations described above.

207.   A&W and Yum! knew the statements and representations mentioned in the above paragraphs were false or misleading, or were made in reckless disregard of their truth or falsity, and further knew that material omissions occurred in connection with their affirmative statements of fact.

208.   In the alternative, A&W and Yum! breached their duty to make certain that their agents' representations were truthful and/or supported by facts.

209.   A&W and Yum! made statements and representations to Nickleson with the intent to inducing Nickleson into owning and operating a new 3-D franchise in Inver Grove Heights and paying the substantial royalty fees associated therewith.

210.   Nickleson reasonably believed the statements and representations made to him by A&W and Yum! were true, and justifiably relied on them in deciding to own and operate the Inver Grove Heights Franchise.

211.   The conduct by A&W and Yum! in inducing Plaintiffs to serve as franchisees/guarantors and to make substantial investments of time and money in reliance on A&W's and Yum!'s unjustified representations to Plaintiffs constitutes fraud.

212.   The statements identified in the body of this complaint made by A&W and Yum! representatives, in order to induce Plaintiffs to invest in A&W-brand franchises, were both false and willfully made with knowledge of their falsity.

213.   Plaintiffs have been damaged by the fraud perpetrated by A&W and Yum!.

214.   The amount of damages which have been suffered, or will be suffered, by Plaintiffs cannot now be exactly determined. Such damages are alleged to significantly exceed $75,000, and will be fully demonstrated at a trial on the merits.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief:

1.   Award Plaintiffs their full amount of actual damages;

2.   Award Plaintiffs rescission damages in the amount of their investment in their franchises;

3.   A declaratory judgment excusing Plaintiffs from any further obligation to Defendants, including but not limited to those obligations set forth in the franchise, note, and guaranty agreements;

4.     A declaratory judgment granting Plaintiffs rescission of any contractual relationship with Defendants;

5.     Award Plaintiffs their complete costs, disbursements and reasonable attorneys' fees incurred herein, to the extent authorized under applicable law; and

6.     Award Plaintiffs such other and further relief as may be deemed just and appropriate.

DATED: _____, 2011

**DADY & GARDNER, P.A.**

By _____
     J. Michael Dady (MN #2062X)
     John D. Holland (MN #028614X)
5100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
PH:    (612) 359-9000
FX:    (612) 359-3507

**ATTORNEYS FOR PLAINTIFFS**